# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RITCHIE CAPITAL MANAGEMENT, LLC, ) | |
| ) | |
| Plaintiff, ) | No. 17 C 4949 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| COSTCO WHOLESALE CORP. and ) | |
| NATIONAL CLOTHING COMPANY, INC. ) | |
| d/b/a NATIONAL DISTRIBUTORS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Ritchie Capital Management is an investment firm that is trying to recoup losses that it attributes, at least in part, to a fraud scheme in which the Defendants allegedly participated. The scheme was carried out by Thomas Petters, who agreed to purchase various goods that ultimately would be supplied to Costco. R. 10, Am. Compl. at 1-2 ¶¶ 3-5; 12 ¶¶ 26, 29; 15 ¶ 37.[1] Petters funded the scheme with loans from Lancelot hedge funds, in which Ritchie had invested. *Id.* at 3-4 ¶¶ 7-8; 17 ¶ 51. In reality, Petters purchased very few goods, and Petters used new investor money to pay off older loans. *See* Am. Compl. at 4 ¶ 11.[2] After the Ponzi scheme was revealed in 2008, Lancelot filed for bankruptcy. *In re Lancelot Investors Fund, L.P.*,

---

[1] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.
[2] The mechanics of Petters's Ponzi scheme are more fully described in Lancelot's bankruptcy litigation. *See In re Lancelot Investors Fund, L.P.*, 408 B.R. 167, 169-70 (Bankr. N.D. Ill. 2009).

408 B.R. 167, 169-70 (Bankr. N.D. Ill. 2009).[3] Ritchie allegedly lost over $100 million in its investments, and now sues Costco (and one of its subsidiaries, National Distributors) for fraud, aiding and abetting that fraud, and civil conspiracy. Am. Compl. at 23-25 ¶¶ 78, 82, 86, 90. Costco and National Distributors move to dismiss the Amended Complaint in its entirety. R. 38, Def. Mot. to Dismiss at 1. For the following reasons, the motion is granted because the Court lacks personal jurisdiction over the Defendants.

## I. Background

For purposes of evaluating the dismissal motion, the Court accepts as true the allegations in the Amended Complaint. Costco Wholesale Corporation is a general retailer that operates warehouse stores throughout the United States, selling wholesale goods at below-market prices. Am. Compl. at 7 ¶ 3. Costco and its wholly-owned subsidiary, National Clothing Company (which does business under the name National Distributors), are both incorporated and have principal places of business in Washington. Am. Compl. at 5 ¶ 1b-c.[4] Because of its discount retailer status, Costco was unable to purchase (in order to resell) certain brand-name consumer electronics—for example, plasma televisions—due to manufacturer restrictions on selling to warehouse clubs. *Id.* at 7 ¶¶ 4-5. To get around those constraints, Costco used a series of other businesses and people, called diverters, to

---

[3]This Court has subject matter jurisdiction over the case under 18 U.S.C. § 1332. Ritchie and the Defendants are citizens of different states and the amount in controversy is much more than $75,000.
[4]For simplicity, the Opinion refers to both entities together as Costco, unless context dictates otherwise.

2

purchase the products it wanted to sell and funneled the products through its own subsidiary, National Distributors. *Id.* at 1 ¶ 2; *see id.* at 8 ¶ 11.

In around 1992 (long before Ritchie entered the picture), Costco began a business relationship with Thomas Petters, a diverter with ties to authorized electronic distributors. Am. Compl. at 7 ¶ 5. To keep up with the volume of bulk purchases that Costco required, Petters needed additional financing. *See id.* at 1 ¶¶ 2-3. In around 2000, General Electric Capital Corporation (for convenience's sake, GE) issued a $50 million line of credit to Petters to finance the product purchases for Costco, based on purchase orders that supposedly had been issued by Costco and National Distributors; the purchase orders provided a guarantee of payment. *Id.* at 8 ¶¶ 11-12.

According to Ritchie, GE's issuance of the line of credit is when Costco became aware of Petters's fraud. Am. Compl. at 9 ¶ 14. In October 2000, GE requested that Costco verify fourteen purchase orders, which totaled over $50 million. *Id.* at 8-9 ¶ 13. Costco discovered that the purchase order numbers touted by Petters as proof of his creditworthiness were actually issued to other vendors. *Id.* at 9 ¶ 14. Petters allegedly confirmed to Costco that he had used the purchase order numbers to intentionally misrepresent to GE that Costco owed him around $50 million. *Id.* At this point, instead of informing GE of Petters's fraud, Costco agreed to help Petters refinance the GE debt to avoid disclosing the product diversion scheme. *Id.* at 9 ¶ 17. Costco allegedly provided Petters with what appeared to be checks totaling $48 million, so that Petters could verify to GE that Costco in fact

had owed Petters money. *Id.* at 10-11 ¶¶ 18-23. In truth, however, the checks had already been issued to other payees in much smaller amounts, and had been altered to name Petters as the payee in the inflated amounts. *Id.* at 11 ¶ 21.

Even after the GE debacle, Costco asked Petters to finance other diverters, and to do so without revealing Costco as the ultimate purchaser. Am. Compl. at 12-13 ¶¶ 29-30. Costco allegedly provided Petters with fake purchase orders in order to induce lenders to finance loans to him, and Petters in turn would provide the fake purchase orders to diverters, so in the end it looked like Petters was the actual purchaser rather than an intermediate financer. *Id.* at 12-13 ¶ 33. To get financing for the ongoing scheme, Petters created a number of special purpose entities based out of Minnesota to appear as the purchaser of diverted goods. *Id.* at 15 ¶ 38. Petters urged an associate, Greg Bell, to found Lancelot Investment Management, another company created to provide financing for the Costco diversions. *Id.* ¶ 39-40.

This is where Ritchie Capital Management enters the picture. Ritchie is an investment administrative manager and has its principal place of business in the Cayman Islands. Am. Compl. at 5 ¶ 1a; *id.* at 6 ¶ 1. Ritchie relied on a memorandum, prepared by Bell on behalf of Lancelot, detailing a low-risk investment in Lancelot, because the goods to be purchased with investor money already had a bound buyer—supposedly Petters. *Id.* at 16-17 ¶¶ 49-52. Ritchie Capital invested in Lancelot based on these representations, as well as on Bell's claims that Lancelot had credit insurance (which was obtained using the fraudulent purchase orders). *Id.* at 17-18 ¶¶ 53-56. Each year, Ritchie received audited

4

financial statements for Lancelot and relied on them to invest more money in Lancelot. *Id.* at 18 ¶¶ 57-58. Eventually, in around 2007, Ritchie explored the sale of its shares in a $1.1 billion restructuring, and the valuation opinion took the Lancelot Fund values into account. Am. Compl. at 20 ¶¶ 64-66. The valuation opinion set the interests in Lancelot at $50 million. *Id.* at 21 ¶ 69.

The fraud scheme began to unravel when the FBI discovered that Petters was not actually selling merchandise to Costco, and had not been since around 2003. Am. Compl. at 19 ¶ 60. Once it became clear that the Lancelot funds were worthless, Ritchie incurred a $50 million liability for the overvaluation. *Id.* at 21 ¶ 72. Ritchie also lost its chance to collect around $44 million in deferred payments. *Id.* at 21-22 ¶ 73.

Not surprisingly, Petters was charged in a federal criminal case. In 2009, during Petters's criminal trial, a senior-management Costco executive testified that Costco did "very little" business with Petters in 2000; Costco had stopped working with Petters by 2008; and Costco had never issued fake purchase orders or guarantees. Am. Compl. at 22 ¶ 74. More recently, in 2014, Ritchie learned that Costco allegedly did conduct "substantial" business with Petters, even after discovering the false purchase orders, and issued additional guarantee letters to Petters after 2006. *Id.* at 22 ¶ 75.

Ritchie's direct losses from its Lancelot investments exceed $94 million. Am. Compl. at 19 ¶ 60. Now, Ritchie claims Costco contributed to the wrongful acts of Petters, Bell, and Lancelot. The Amended Complaint asserts claims for aiding and

5

abetting, fraud, and conspiracy. *See id.* at 23 ¶ 78; 24 ¶ 86; 25 ¶¶ 90-94. Ritchie alleges that Costco's involvement with Petters gave an "air of legitimacy" to Lancelot's actions. *Id.* at 19 ¶ 59. Finally, Ritchie argues that Costco fraudulently concealed its relationship with Petters during the criminal trial. *Id.* at 22 ¶ 76. Costco and National Distributors move to dismiss, arguing that this Court lacks personal jurisdiction over them; that Ritchie lacks standing to bring the suit; and that the Amended Complaint fails to state a claim. *See* Def. Mot. to Dismiss. As explained below, the defense is right that there is no personal jurisdiction over them in this District, so the case is dismissed on that ground.

## II. Standard of Review

"[A] complaint need not include facts alleging personal jurisdiction." *Steel Warehouse of Wis., Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998). However, the plaintiff bears the burden of establishing that personal jurisdiction is proper once challenged by the defendant. *Purdue Research Found v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When evaluating personal jurisdiction on a motion to dismiss, the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *Id.* at 782 (quoting *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). In considering the *prima facie* case, the plaintiff is "entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Id.* at 782 (quoting *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)). This is in contrast to what is "[n]ormally [done] on review of a motion to dismiss," where the Court "accepts all well-pleaded allegations in the

6

complaint as true." *Hyatt,* 302 F.3d at 713. A defendant can submit affidavits or other materials challenging personal jurisdiction, which a plaintiff must affirmatively refute with supporting evidence. But a defendant's uncontested assertions will be accepted as true. *See Purdue Research Found.,* 338 F.3d at 782-83.

### III. Analysis

### A. Personal Jurisdiction

Personal jurisdiction refers to a court's "power to bring a person into its adjudicative process." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). Courts may exercise either general or specific personal jurisdiction. *Daimler AG v. Bauman,* 571 U.S. 117, 134 S. Ct. 746, 754 (2014). General jurisdiction refers to a court's authority to hear "any and all" claims against a defendant, regardless of where the pertinent events took place. *Goodyear Dunlop Tires Operations., S.A. v. Brown*, 564 U.S. 915, 919 (2011). In contrast, specific jurisdiction is confined to adjudicating an "activity or an occurrence" that takes place in the forum. *Id.* States can only haul non-resident defendants into court to the extent allowed by due process. *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 108 (1987); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Due process requires that a defendant have "certain minimum contacts with [the state] such that" the suit does not "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

A district court sitting in diversity has personal jurisdiction over a non-resident defendant only if a court in the state where it sits would have jurisdiction. *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 548 (7th Cir. 2004). On the surface, Illinois law governs this Court's personal jurisdiction over the Defendants. The Illinois long-arm statute authorizes personal jurisdiction over a non-resident defendant doing business or committing tortious acts within the state. 735 ILCS 5/2-209. It also permits the Court to exercise jurisdiction "on any other basis" allowed by the Illinois and federal Constitutions. *Id.* at 5/2-209(c). So the Illinois long-arm statute puts the inquiry back into federal-law hands: whether exercising personal jurisdiction would comply with federal constitutional due process. Ritchie argues that both general and specific personal jurisdiction apply to Costco, R. 45, Pl. Resp. Pers. Jurs. at 5, 10, so the Court examines each in turn.

**1. General Jurisdiction**

A court may exercise general jurisdiction over a defendant only when its connections with the state are so "continuous and systematic" as to render it "essentially at home" in the forum state. *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe,* 326 U.S. at 317). As of late, the Supreme Court has emphasized that general jurisdiction "should not lightly be found," because that would mean that the defendant can be sued for *anything* in the particular forum, no matter the case's lack of connection to the state. *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 698 (7th Cir. 2015) (citing *Goodyear,* 564 U.S. at 919). So far, the Supreme Court has deemed a corporation at home only in the state (or states) of its incorporation

8

and principal place of business. *Kipp*, 783 F.3d at 698 (citing *Daimler,* 134 S. Ct. at 760). Outside of those states, the "Due Process Clauses of the Fifth and Fourteenth Amendments permit courts, federal and state, to exercise general jurisdiction only when the continuous corporate operations within a state are so substantial and of such a nature as to justify suit on causes of action arising from dealings entirely distinct from those activities." *Kipp,* 783 F.3d at 698 (quoting *Daimler,* 134 S. Ct. at 761) (cleaned up).[5]

The Illinois activities of Costco and National Distributors do not come close to triggering general jurisdiction. In *Daimler*, sizable California sales did not constitute continuous and systematic activities in that state, where the Defendant's incorporation and principal place of business were elsewhere. *Daimler*, 134 S. Ct. at 752, 761-62. Costco is neither incorporated nor based here; it has only ten Illinois warehouse stores; and the Illinois stores comprise 2% of its over-700 warehouse stores worldwide. R. 47, Def. Reply Pers. Jurs. at 10 n.6; R. 48, Pentelovitch Decl., Exhs. B, C. Ritchie seems to suggest that *Daimler* and *Goodyear* created a business percentage threshold that Costco surpassed by having a certain number of stores or reaping a certain percentage of sales. Pl. Resp. Pers. Jurs. at 12. But neither case says that, and indeed *Goodyear* rejected the "sprawling view of general jurisdiction" that would allow large corporations to be sued essentially everywhere that its products are distributed. *See Goodyear*, 564 U.S. at 929 (refusing to hold that "any substantial manufacturer or seller of goods would be amenable to suit, on any claim

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g.*, *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

for relief, wherever its products are distributed."). And if Costco is "at home" in every state where it has 10 or more stores, then it probably would be subject to general jurisdiction in several other populous states—it has 514 locations in 44 states. So a slip-and-fall personal injury case in, say, Costco's Anchorage, Alaska store could be brought in courts in Illinois, California, Texas, Florida, and so on, because Costco presumably would be subject to general jurisdiction in any of those states. The Due Process Clause cannot be stretched so far.

### 2. Specific Jurisdiction

The true question in this case is whether the Defendants are subject to specific personal jurisdiction in this Court. Whether minimum contacts justify specific personal jurisdiction turn on "the relations among the defendant, the forum, and the litigation." *Adv. Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (citing *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)). Due process requires that a defendant's "suit-related conduct" must create "a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121. There is a fine line between the defendant's *conduct* in the state and where *effects* of the conduct are felt. The mere fact that a defendant's conduct "affected plaintiffs with connections to the forum State" does not trigger specific jurisdiction. *Id.* at 1126. The defendant *itself* must "in each case" commit some act by which it "purposefully avails itself of the privilege of conducting activities" in the state, thereby "invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

10

The whole point of the "purposeful availment" doctrine is to ensure defendants will not be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475 (cleaned up). To repeat: the minimum contacts supporting jurisdiction must "arise out of contacts that the 'defendant *himself* creates with the forum.'" *Walden*, 134 S. Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475). Regardless of the size or complexity of a *plaintiff's* connection with the forum state, a plaintiff's or other third parties' contacts with the forum do not satisfy the requirement. *Adv. Tactical*, 751 F.3d at 801 (citing *Burger King*, 471 U.S. at 475). These same requirements apply when intentional torts form the foundation of a claim. *Walden*, 134 S. Ct. at 1123 (citing *Calder v. Jones*, 465 U.S. 783 (1984)).

Here, Ritchie appears to present three tests that supposedly confer specific jurisdiction over Costco. Pl. Resp. Pers. Jurs. at 5. But really the analysis boils down to the purposeful-availment test reiterated by the Supreme Court in *Walden*. For example, Ritchie first cites *Calder* to argue that there is an intentional-tort test for specific jurisdiction. *Id.* at 6; *see Calder,* 465 U.S. at 789-90. It is true that a defendant's intentional conduct, directed at a particular state, can support specific jurisdiction. But the *effects* of an intentional tort do not count, despite Ritchie's reliance on its own alleged damages. As the Supreme Court emphasized in *Walden,* intentional torts do not automatically confer specific jurisdiction by virtue of where the plaintiff got injured—rather, an injury is "jurisdictionally relevant only insofar

11

as it shows that the defendant has formed a contact with the forum State." 134 S. Ct. at 1125.

Turning to this case, Ritchie argues that its injuries arise from Costco's Illinois activities. Pl. Resp. Pers. Jurs. at 6. But that is not what Ritchie alleges, nor has it offered evidence in support of *Costco*'s acts in Illinois. Yes, Costco allegedly created fraudulent purchase orders and misleading checks to help *Petters* lure unsuspecting investors, and Petters and Bell engaged in fraud in Illinois. But there is neither an allegation nor evidence that *Costco* itself did anything in Illinois or directed any act into Illinois. The purchase orders were not created or issued in Illinois, and Costco made no representations in Illinois. *See* Am. Compl. at 8-10 ¶¶ 9-19.

Ritchie tries to overcome this hurdle by saddling Costco with Petters's and Bell's jurisdictional baggage. As a legal matter, Ritchie points out that Illinois's long-arm statute authorizes jurisdiction over an entity for acts done through its agent. 735 ILCS 5/2-209(a); Pl. Resp. Pers. Jurs. at 7. As a factual matter, according to Ritchie, Costco recruited Petters to act as its "agent" to obtain financing for the diversion scheme, and Petters in turn recruited Bell to obtain investors for the loans. Pl. Resp. Pers. Jurs. at 6-7. It was Bell who met with Ritchie Capital in Chicago to urge it to invest in Lancelot. And that is really the extent of the Illinois connection. *Id.* At the end of the day, then, Ritchie argues that Costco knew Bell was meeting with Ritchie in Chicago, and that is enough for specific jurisdiction. *Id.* at 7; *see* Am. Compl. at 9 ¶ 14.

This is not enough to establish that Bell was Costco's agent or that Costco directed Bell to commit the fraud in Illinois. *See ABN AMBRO, Inc. v. Capital Int'l Ltd.,* 595 F. Supp. 2d 805, 822-23 (N.D. Ill. 2008) (requiring "enough evidence to support its *prima facie* case of an agency relationship" to overcome personal jurisdiction barrier). An agency relationship requires, as pertinent here, that a corporation and a person agree that the putative agent will act on the principal's behalf, under its control, and with the power to "affect the legal relations of the principal." *Clarendon Nat. Ins. Co. v. Medina,* 645 F.3d 928, 935 (7th Cir. 2011) (cleaned up). But the Amended Complaint does not allege that Petters or Bell were agents of Costco, nor does it allege facts that would establish an agency relationship. *See* Am. Compl. For one, Ritchie alleges that Petters originally used the Costco purchase order numbers *without* Costco's knowledge to obtain the GE loan. *See* Am. Compl. at 9 ¶ 14. Later, Costco did allegedly agree with Petters to help refinance the debt, but supposedly in an effort to hide the diversion scheme, Am. Compl at 9 ¶ 17—not to enter into an agreement to make Petters an agent of Costco on its brand-name electronics purchases. Petters only acted at Costco's "request[]" to continue financing the diversion efforts, Am. Compl. at 12-13 ¶¶ 29-30, and Costco allegedly later "agreed to provide" Petters with additional purchase orders, Am. Compl. at 13 ¶ 33. Those facts do not comprise a principal-agent relationship in which Costco is directing Petters and in which Petters is acting primarily for the benefit of Costco (like an employee).[6] To be sure, there is a working

---

[6]*See Krug v. Machen,* 321 N.E.2d 85, 90 (Ill. App. Ct. 1974) ("Additionally, the Restatement (Second) of Agency has distinguished an agent from a supplier or seller in the

13

relationship between Costco and Petters, but each performed its own actions in its own interest.

Even if Petters somehow was Costco's agent, Ritchie needs to go one step further and make the case that *Bell* was Costco's agent. But the Amended Complaint asserts that Bell founded Lancelot "at the urging" of Petters, Am. Compl. at 15 ¶¶ 39-40—not Costco. And Bell "made all significant decisions" for Lancelot, without any input, guidance, or control from Costco. *Id.* at 15-16 ¶ 42; Def. Reply Pers. Jurs. at 5 (undisputed as to Costco). There is no hint that Costco directed Bell to set up the meeting with Ritchie and to do so in Chicago. Imputing personal-jurisdiction contacts from one person onto the defendant requires that the defendant exercise "an unusually high degree of control" of the other person. *Abelesz v. OTP Bank*, 692 F.3d 638, 658-59 (7th Cir. 2012) (cleaned up). That level of control is not established here.

Ritchie also argues that its damages were suffered here in Illinois, so specific jurisdiction is proper. But that argument incorrectly attributes its *own* forum connections to Costco. *See Walden*, 134 S. Ct. at 1125. Even if every single dollar was lost in Illinois, that would not count toward the jurisdictional analysis. Ritchie's approach to the minimum contacts analysis "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Walden*, 134 S. Ct. at 1125.

---

following manner: 'One who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself.'" (quoting Restatement (Second) of Agency § 14K (1957)).

In its final bid to trigger specific jurisdiction, Ritchie invokes what it deems a "conspiracy theory of jurisdiction," which requires that Ritchie allege "both an actionable conspiracy and a substantial act in furtherance" of it performed in Illinois. Pl. Resp. Pers. Jurs. at 8. But Illinois courts do not recognize conspiracy participation as a basis for long-arm jurisdiction, and the Seventh Circuit has "dashed cold water on the prospect." *Hang Glide USA, LLC v. Coastal Aviation Maint.*, 2017 WL 1430617, at *3 (N.D. Ill. April 18, 2017) (citing *Smith v. Jefferson Cty. Bd. of Educ.*, 378 Fed. App'x 582, 585-86 (7th Cir. 2010) (non-precedential disposition)).[7]

Ultimately, Ritchie fails to allege or offer evidence that any *Costco* conduct is connected to Illinois. None of Costco's acts were purposefully directed at Illinois: Ritchie and Costco never interacted in Illinois; Costco and Petters did not operate their alleged scheme in Illinois; and Ritchie does not allege that Costco issued the fraudulent purchase orders in Illinois. Specific jurisdiction does not apply in this Court.

---

[7]Even if the theory were viable, simply alleging a conspiracy with an Illinois defendant, such as Bell, while making "no effort to connect" him with the out-of-state defendant would not be enough. *Smith¸* 378 Fed. App'x at 586 (non-precedential disposition). In cases of alleged conspiracies, Illinois courts hold firm that "there is no shortcut, and there is no substitute" for the standard personal jurisdiction analysis: "A court should look at each defendant's activities. If a conspirator's actions were purposefully aimed at the forum, then jurisdiction is present. If not, assertion of jurisdiction would be unconstitutional." *Ploense v. Electrolux Home Prods., Inc.*, 882 N.E.2d 653, 668 (Ill App. Ct. 2007) (cleaned up). As explained above, the Amended Complaint does not directly connect Costco with Bell, so Ritchie has failed to adequately allege that they were conspirators for purposes of tagging Costco with Bell's jurisdictional conduct.

### B. Jurisdictional Discovery

One final note: in passing, Ritchie argues that if the Court concludes that there is no personal jurisdiction over the Defendants, then Ritchie should be allowed to take jurisdictional discovery. Pl. Resp. Pers. Jurs. at 9, 12. Ritchie barely expounds on this argument, saying only that it would look for Costco's relationship "with the other documents provided by Bell to Plaintiff in Illinois," and Costco's degree of contacts in Illinois "relative to their contacts out of the state." *Id.*

The request for leave is denied, because Ritchie has forfeited it. It is generally true that jurisdictional discovery should be granted when a plaintiff establishes a *prima facie* case for personal jurisdiction. *Purdue Research Found.*, 338 F.3d at 782. But here, even reading the Amended Complaint expansively and resolving all disputes in the record in Ritchie's favor, *see Cent. States, S.E. & S.W. Areas Pension Fund v. Phencorp Reins. Co.,* 440 F.3d 870, 877-78 (7th Cir. 2006), the allegations are not "ambiguous or unclear on the jurisdictional issue." *United Wholesale LLC v. Traffic Jam Events*, 2012 WL 1988273, at *1 (N.D. Ill. June 4, 2012).

What's more, Ritchie delayed asking for jurisdictional discovery even after the Court explicitly directed the parties to confer on whether personal jurisdiction discovery was necessary. R. 44, 08/29/17 Minute Entry. Ritchie elected not to seek discovery. R. 46, 10/04/17 Minute Entry ("As discussed during the hearing, Plaintiff decided to forgo jurisdictional discovery and simply respond to the dismissal motion."); *see also* Def. Reply Pers. Jurs. at 2 n.1 (describing Ritchie's decision not to issue discovery requests). In its briefing, Ritchie made only a passing request for

16

discovery, and failed to explain concretely what it wanted to request and what it expected to find. No jurisdictional discovery is warranted.

## IV. Conclusion

For the reasons discussed, the motion to dismiss is granted. The Court lacks personal jurisdiction over the Defendants. There is no need to address the other merits-based arguments (which the parties can re-raise if suit is filed in the Defendants' home jurisdiction). The status hearing of April 18, 2018 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 30, 2018